UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

INDIA BREWERIES INC.,

        Plaintiff,

        v.                               Case No. 05-C-0467

MILLER BREWING COMPANY,

        Defendant.

DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
AND DISMISSING PLAINTIFF'S CLAIMS

        India Breweries Inc. (IBI) sues Miller Brewing Company in a two-count complaint. Count I asserts breach of a License Agreement concerning production and sale of Miller beer by IBI in India, whereas, Count II asserts breach of an alleged importation contract. (Compl. at 8-9.) Miller counterclaims charging for fraudulent inducement based on false representations by IBI regarding its work in upgrading and improving certain breweries prior to execution of the License Agreement. Alternatively, Miller contends that IBI breached their contract resulting in the loss of royalties. (Answer at 14-15.)

        Miller moves for summary judgment on IBI's claims.[1] In response to Miller's arguments regarding Count II, IBI concedes that it has no claim and attempts to "withdraw[]" that count. (Pl.'s Br. in Opp'n at 29.) However, at this point in the litigation, IBI cannot simply dismiss a claim without the consent of Miller or an order of this court.

---

[1]IBI, in its response brief, contends that Miller should not be granted summary judgment on its fraudulent inducement or recission claim. In reply, Miller states that it is entitled to judgment on its recission claim. However, Miller's summary judgment motion, by its express language, attacks only Counts I and II of IBI's claims. (Def.'s Mot. for Summ. J. at 2 ("Miller is Entitled to Summary Judgment on Counts I and II of IBI's Complaint.").) Further, Miller's opening brief fails to discuss at all the effect of its summary judgment motion on its own counterclaims. Therefore, Miller's counterclaims are not addressed by this Decision and Order.

(*See, e.g.*, Fed. R. Civ. P. 41(a).) Therefore, summary judgment will be granted in Miller's favor as to Count II.

Count I remains, and on that count IBI asserts damages of at least $5 million in out-of-pocket losses and at least $500 million in lost profits. (Compl. at 9.) As discussed below, summary judgment will be granted on Count I as well.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

2

Miller Brewing Company is a Wisconsin corporation; its principal place of business is located in Milwaukee, Wisconsin. (Def.'s Proposed Findings of Fact (DPFOF) ¶ 1.[2]) India Breweries Inc., is a foreign corporation, organized under the laws of Ontario, Canada, with its principal place of business in Toronto, Ontario. (DPFOF ¶ 2; Pl.'s Proposed Findings of Fact (PPFOF) ¶ 1; *see* Compl. ¶ 1; Cade Aff. Ex. 21 (letterhead).)

IBI functions as a holding company. (DPFOF ¶ 3.) It is "virtual brewer," inasmuch as it does not own any breweries or brewing equipment directly. (PPFOF ¶ 4.) The rights to brew Pabst beer in India were among IBI assets. (PPFOF ¶ 5.)

IBI owns International Breweries Holding (IBH), a company incorporated in the Turks and Caicos Islands in the British West Indies. (PPFOF ¶ 2.) It was the intention of IBI that IBH hold the shares of International Breweries Pvt. Ltd. (IBP). (DPFOF ¶ 5; Judge Decl. ¶ 5.) IBP is an Indian entity, which was incorporated on February 10, 1995. (DPFOF ¶ 6.)

Mohan Meakin Ltd. is a brewing and distilling company in India and is India's oldest brewer. (DPFOF ¶ 9; PPFOF ¶ 7.) A Delhi brewery called Mohan Nagar and a Madras brewery known as Chennai are among Mohan Meakin's assets. (DPFOF ¶ 10.) Brigadier Kapil Mohan is a principal owner of Mohan Meakin. (PPFOF ¶ 207.)

Mohan Meakin and IBI entered a Production Agreement on May 1, 1997, and a Joint Venture Agreement on May 3, 1997, for the purpose of selling international beer,

_____

[2]Unless noted otherwise, a cited proposed finding of fact submitted by Miller was admitted by IBI. Admitted proposed findings will be treated like stipulated facts by the court. *See* Civil L.R. 56.2(b)(1), (e). A cited proposed finding of fact submitted by plaintiff either was admitted or, if denied, must be taken in IBI's favor.

3

including Pabst. (DPFOF ¶ 25; PPFOF ¶ 6; Cade Aff. Ex. 18.) In late 1998 or 1999 IBP was formed as a joint venture of IBI and Mohan Meakin, with each entity owning fifty percent. (DPFOF ¶ 11.)[3]

At some point in 1997 or 1998, IBI and Miller began talking. (*See* DPFOF ¶¶ 62-67.) Miller's strategy was to enter the Indian beer market with "zero cash outlays and financial risk." (PPFOF ¶ 11.)

On April 2, 1998, Miller provided IBI with its list of the minimum equipment necessary for the production of Miller beer. (DPFOF ¶ 63.) Later that month, IBI told Miller that it and Mohan Meakin planned to upgrade Mohan Meakin's Delhi brewery to Miller's satisfaction. (DPFOF ¶¶ 64, 67.) On June 15, 1998, IBI authorized its president and CEO, Steven Judge, and its executive vice president, Peter Harvey, to negotiate and enter a licensing agreement with Miller. (DPFOF ¶ 71.)

In a letter to Miller dated July 4, 1998, Judge indicated that IBI had raised money for upgrading and expanding breweries in Delhi and Bombay. (DPFOF ¶ 72.) An upgrade list for the Delhi brewery accompanied the letter, stating that several pieces of equipment would be added to the Delhi brewery, including a double vacuum filler. (DPFOF ¶ 73; Def.'s Exs. to Proposed Findings of Fact (Def.'s Exs.) Ex. 36 at IBI 234; Cade Aff. Ex. 23 at IBI 234.) A double-evac bottle filler was included on Miller's minimum equipment list.

_____

[3]IBI has indicated that IBP was jointly owned by IBH and Mohan Meakin, but there is some confusion on whether IBI or IBH owned it, or whether certain individuals held the shares of IBP "in trust" for IBI or IBH or Mohan Meakin. (DPFOF ¶ 4, 5, 13; *see* DPFOF ¶¶ 15-24.) Whether IBP was owned by IBI or by its wholly-owned subsidiary IBH is immaterial for present purposes, as is whether Indian law or practice involved individuals holding shares in trust. For present purposes, the court treats IBP as being owned by Mohan Meakin and IBI or IBH. In January 2001, Mohan Meakin withdrew from the joint venture and relinquished its share of IBP to either IBI or IBH. (DPFOF ¶¶ 20, 21; Mohan Decl. ¶ 9.)

4

(DPFOF ¶ 70.)   In an e-mail dated January 7, 1999, Miller's Director-International Operations, Giorgio Sega, outlined the equipment and processing upgrades needed at Mohan's Delhi brewery.  (DPFOF ¶ 74.)  The e-mail message was forwarded to IBI's Judge on January 19, 1999.  (DPFOF ¶ 75.)

Miller drafted the licensing agreement.  (PPFOF ¶ 13; Judge Decl. ¶ 44.)[4] Dan McNally, a Miller in-house attorney at the time, was the primary in-house lawyer working on the license agreement with IBI.  (PPFOF ¶ 12; Def.'s Resp. to Pl.'s Proposed Findings of Fact (Def.'s Resp.) ¶ 12.)   IBI's Judge admits that he was involved in negotiations that led to the signing of the final version of the licensing agreement.  (Judge Decl. ¶ 44.)

On or about September 22, 1999, Miller and IBI entered a License Agreement for IBI to produce and sell certain Miller products in India.   (DPFOF ¶ 86; Compl. ¶ 3, Ex. 1; Answer ¶ 3.)  In the License Agreement, IBI warranted that it would produce licensed beer "in strict accordance" with Miller's recipes and specifications. (Compl. ¶ 3, Ex. 1 at 15; Answer ¶ 3; *see* DPFOF ¶ 87.)  Paragraph 1.2 of the License Agreement read:

> 1.2   *Sublicensing/Contract Brewing*
> Subject to the terms and conditions of this Agreement (e.g. Paragraph 2.5), IBI may, with the prior consent of Miller (which consent shall not be unreasonably withheld) sublicense its brewing and distribution rights under this Agreement to IBP (including the right to retain a contract brewer – e.g. Mohan and/or an IBP wholly-owned subsidiary) for the brewing of some or all of the Licensed Beer(s) in the Territory pursuant to this license.   However, nothing herein requires Miller to

---

[4]Miller admits only that it prepared the first draft of the agreement and asserts that IBI negotiated provisions in the final document.  (*See* Def.'s Resp. to Pl.'s Proposed Findings of Fact (Def.'s Resp.) ¶ 13.)  The court must accept as true Judge's statement that Miller drafted the agreement.

5

approve a sublicensee other than IBP, or a contract brewer other than IBP, an IBP wholly-owned subsidiary, and/or Mohan.

(Compl. ¶ 3, Ex. 1 at 3; Answer ¶ 3.) Paragraph 2.5 then read:

> 2.5 *Tests and Acceptances.* With respect to each brewery where a Licensed Beer is to be brewed, IBI (after consultation with and inspection by Miller) will conduct (or cause to be conducted) commercial scale test brews of each Recipe that is to be used at that brewery. Prior to beginning commercial brewing of each Licensed Beer at the brewery in the Territory, IBI will obtain Miller's written approval of the brewery and the Licensed Beer(s) made at that brewery, which approval shall not be unreasonably withheld. . . . Where brewing is to be performed by a sublicensee or a contract brewery no such sublicensed or contract brewing-brewing may take place unless Miller has approved in writing the brewer, the brewery, the confidentiality protection relating thereto, and the terms of the sublicensing/contract brewing relationship. Further, Miller need not approve any sublicensing or contract brewing (and/or sublicensee or contract brewers) for any brand(s) other than the Schedule A brands of Licensed Beers.

(DPFOF ¶ 93; Compl. ¶ 3, Ex. 1 at 12; Answer ¶ 3.)

Regarding assignment of rights or obligations under the contract, paragraph 6.14 provided:

> 6.14 *Binding Effect; Assignment.* Neither party shall assign or sublicense this Agreement or any part of their interest therein without the written consent of the other, except that Miller may assign its rights hereunder to a successor to its business or to an affiliate even without such consent, and except that Miller will not unreasonably refuse to consent to the sublicensing of this Agreement to IBP, and Miller will not unreasonably refuse to consent to IBP using Mohan or an IBP wholly-owned subsidiary as a contract brewer. No such assignment or sublicense will relieve the assignor of its obligations hereunder.

(DPFOF ¶ 94; Compl. ¶ 3, Ex. 1 at 36; Answer ¶ 3.)

6

The License Agreement also contained the following provision: "6.17 *Entire Agreement.* Except as the parties may otherwise agree in writing, this Agreement, including the attached schedules, contains the entire understanding of the parties with respect to the subject matter contained herein. . . ." (DPFOF ¶ 94; Compl. ¶ 3, Ex. 1 at 37; Answer ¶ 3.)

All merchandising and advertising activities and IBI's annual marketing plans had to be approved by Miller, but Miller promised to exercise its approval rights in good faith. (Compl. ¶ 3, Ex. 1 at 20, 21; Answer ¶ 3.) IBI's advertising agency and brand manager for Miller beers also were subject to Miller's approval, but Miller promised that its approval would not be unreasonably withheld. (Compl. ¶ 3, Ex. 1 at 20; Answer ¶ 3.)

IBI promised to begin commercial scale distribution in India of a brand of Miller beer no later than June 30, 2000. (Compl. ¶ 3, Ex. 1 at 19; Answer ¶ 3.) The Agreement stated that it would automatically terminate at the end of December 31, 2000, unless either Miller extended the deadline or *all* of the following four conditions were true:

> (i) IBI must itself own, or IBP must own, or IBP must have a contract brewing agreement with, a fully operational brewery in the Territory providing an annual production capacity for Licensed Beer of at least 150,000 hectoliters of malt beverage as of December 31, 2000;
> (ii) Miller must have approved a commercial scale test brew for at least one Licensed Beer pursuant to Paragraph 2.5 by December 31, 2000;
> (iii) the distributor network for Licensed Beer in the Territory must have been approved by Miller by December 31, 2000 (such approval not to be unreasonably withheld); and
> (iv) By December 31, 2000, Miller must have approved IBI's 2001 annual Marketing Plan for Licensed Beer(s) (such approval not to be unreasonably withheld).

(DPFOF ¶¶ 95; Compl. ¶ 3, Ex. 1 at 25-26 (¶ 5.1(g)); Answer ¶ 3.)

Paragraph 2.4(c) of the License Agreement provided that "at mutually agreed times, members of Miller's brewing staff may visit IBI (or its sublicensee or the contract brewer(s)) to consult with them relating to the Licensed Beer(s)." (DPFOF ¶ 92; Compl. ¶ 3, Ex. 1 at 11; Answer ¶ 3.)

The License Agreement granted IBI a right of first refusal in the event Miller decided to brew additional Miller brands in India other than those included in the License Agreement. (PPFOF ¶ 16.) Paragraph 6.15 stated that the License Agreement "shall not be construed as contemplating any act or prohibition to act which would violate the laws or regulations of any relevant province or country." (Compl. ¶ 3, Ex. 1 at 36; Answer ¶ 3.)

William Berg served as Miller's Asia Pacific Managing Director from approximately July or August of 1999 until 2002. (PPFOF ¶ 77.) Other than a presentation he had seen while in a prior position at Miller, Berg had no involvement with IBI until he became Asia manager and assumed responsibility for the negotiation of the license agreement with IBI. (PPFOF ¶ 80.) When Berg assumed responsibility for the IBI License Agreement, Miller was "very far down that road in terms of moving ahead with India Breweries." (PPFOF ¶ 86; Cade Aff. Ex. 12 at 25.)

Berg was the primary decision maker at Miller regarding the IBI relationship. (PPFOF ¶ 83.) Before his involvement with the IBI License Agreement, Berg had very little experience in negotiating license agreements. (PPFOF ¶ 81.) Indeed, the IBI License Agreement was Berg's "first new license." (PPFOF ¶ 82.) Berg believed that the sales volume projections in the IBI License Agreement were achievable, given Mohan Meakin's resources and scope within the Indian market. (PPFOF ¶ 85.) When he took over as Asia manager, Berg focused on the business aspects of the License Agreement, such as the

8

Case 2:05-cv-00467-CNC   Filed 10/11/07   Page 8 of 32   Document 197

length of the term, the volumes, the expectations regarding marketing, the brands, and the royalties. (Cade Aff. Ex. 12 at 139-40; *see* PPFOF ¶ 97; Def.'s Resp. ¶ 97.)

Miller's Tim Cochran reported directly to Berg. (PPFOF ¶ 98.) The IBI License Agreement was Cochran's first and only experience in negotiating and implementing Miller license agreements. (PPFOF ¶ 99.)

Giorgio Sega is and was at the time of the License Agreement Miller's Director of International Operations. (PPFOF ¶ 19; Cade Aff. Ex. 11 at 11.) His approval is not required before a licensing agreement is executed. (PPFOF ¶ 101.) But if Miller beer is to be brewed or sold outside of the continental United States or Canada, Sega is involved with the technical aspects of the brand to be brewed or sold. (PPFOF ¶ 20; Def.'s Resp. ¶ 20; Cade Aff. Ex. 11 at 13.) Regardless, Berg has relied on Sega making decisions about technology and equipment of a proposed brewery or contract brewer in his region. (PPFOF ¶ 94.)

Sega had been aware since September 1998 that Judge of IBI's was involved in a potential Miller project in India. (PPFOF ¶ 24.) In approximately November 1998, Sega e-mailed Miller's Dinshaw Guzdar about Mohan Meakin and the technical aspects of brewing. (PPFOF ¶ 68.) Sega's e-mail stated that "[b]ecause of legal restrictions in India re high gravity brewing, we're willing to brew at std. gravity (ie 11.40 Plato, with 11.20 Plato OG in the package." (PPFOF ¶ 69; Cade Aff. Ex. 40 at MBC 000122; PPFOF ¶ 108; Def.'s Resp. ¶ 108.) In addition, Sega wrote that "[i]f they want to palletize manually, that's OK, its only labour." (PPFOF ¶ 70.)

According to Sega, he did not learn of the negotiations with IBI and was not consulted in any way regarding the proposed arrangement with IBI until after the License

9

Agreement was signed. (PPFOF ¶¶ 22, 23.) However, Cochran may have had a conversation with Sega concerning IBI and Miller entering India a month before the License Agreement was signed. (PPFOF ¶¶ 25, 100; Def.'s Resp. ¶¶ 25, 100; Cade Aff Ex. 76 at 25, 30, 32.) Regardless, Berg cannot recall when he and Sega first spoke about the License Agreement. (Cade Aff. Ex. 12 at 36; *see* PPFOF ¶ 87.)

Generally, Miller does not require a licensed brewery to purchase all new equipment prior to brewing Miller beer. (PPFOF ¶ 34.) Instead it will modify existing equipment to its standards. (*Id.*) Regardless of the quality of the equipment, Sega would "of course" look at the equipment to determine if it needed modification. (PPFOF ¶ 35; Cade Aff. Ex. 72 at 232.) Sega was the only person at Miller involved with the IBI License Agreement who could determine whether a proposed brewery's equipment could be modified to meet Miller's standards. (PPFOF ¶ 37.)

On April 26, 1998, IBI informed Miller that the high-gravity brewing process was not allowed by Indian excise authorities. (PPFOF ¶ 106; Defs.' Resp. ¶ 106; Cade Aff. Ex. 22.) Berg admits that Judge informed him at some point that high-gravity brewing was not permitted in India. (Cade Aff. Ex. 12 at 54-55; *see* PPFOF ¶ 91.) Mohan Meakin's owner, Kapil Mohan, has declared that in 1998 and 1999 Mohan Meakin informed Miller that the high-gravity brewing method was not permitted in India under the country's excise regulations. (Mohan Decl. ¶ 6; *see* PPFOF ¶ 209.) Berg says that he recognized the high-gravity brewing process issue when the License Agreement was negotiated. (Cade Aff. Ex. 12 at 55.) However, he cannot remember when he informed Sega and discussed the

10

high-gravity brewing issue with him or what Sega's response was.  (*Id.*)[5]  However, according to IBI's Judge and Mohan Meakin's Kapil Mohan, Miller informed IBI and Mohan that it would be willing to brew Miller-branded beers at standard gravity.  (PPFOF ¶ 107; Cade Aff. Ex. 2 at 118; Mohan Decl. ¶ 6.)[6]

In October 1999, a team from Miller, including Sega and Berg, traveled to India to visit Mohan Meakin's Delhi and Madras breweries, which IBI proposed for purposes of the License Agreement.  (DPFOF ¶ 97.)  Sega prepared a report regarding his inspection of the Delhi and Madras breweries, which was sent to IBI on or about November 22, 1999.  (DPFOF ¶ 101.)  Sega found that the Delhi and Madras breweries were "rudimentary in technology and lacking minimum standards of process; quality assurance; basic food plant hygiene and Good Manufacturing Practices."  (DPFOF ¶ 103; Def.'s Exs. Ex. 48 at IBI 839, 841.)  According to Sega, the Madras brewery was one of the filthiest facilities he had seen in his life.  (DPFOF ¶ 104.)  In October 1999, no double-evac bottle filler and no clean in place (CIP) systems were present at the Delhi brewery. (DPFOF ¶¶ 105, 106.)  Sega advised IBI that it would take nine to ten months to upgrade the Delhi brewery and seven to eight months to upgrade the Madras brewery to Miller's standards.  (DPFOF ¶ 107.)

Sega declined to approve Mohan Meakin's Delhi and Madras breweries. (DPFOF ¶ 109.)  IBI's brewery executive and proposed expert, Bruce Murray, visited Mohan Meakin's Madras brewery in March 2006 and agreed with Sega's assessment of

---

[5]Whether high-gravity brewing is legal or illegal in India is immaterial for purposes of the present motion.

[6]Miller denies this proposed fact and says it merely "suggested" that it could, if necessary, brew at standard gravity, but the court must take the facts in the light most favorable to IBI as the nonmovant.

the brewery. (DPFOF ¶ 110.)[7]  IBI admits that Miller did not unreasonably withhold approval of Mohan Meakin's Delhi or Madras breweries.  (DPFOF ¶ 112.)

At deposition, Sega stated that it was his expectation after the October 1999 trip to India that prior to returning, he would need assurances that any brewery proffered by IBI would have certain minimum equipment.  Moreover, he expected that if IBI lined up a contract brewer that did not use any of the specific equipment, IBI would have to have the equipment installed before he would make a return trip.  (Cade Aff. Ex. 72 at 308 (referenced in PPFOF ¶ 122; Defs.' Resp. ¶ 122).)

On January 11, 2000, IBI's Harvey wrote to Sega, stating that the necessary upgrades to Mohan Meakin's Delhi and Madras breweries were too costly and lengthy. (DPFOF ¶ 118; Cade Aff. Ex. 27.)  IBI stated that it was "now seriously investigating the possibility of upgrading" Mohan Meakin's Artos brewery; IBI provided Sega with technical specifications for the Artos brewery.  (PPFOF ¶ 103; Cade Aff. Ex. 27 at 2 (cited in PPFOF ¶ 127, Defs.' Resp. ¶ 127).)

In February 2000, IBI's Judge and Harvey met with Miller's Berg and Cochran at Miller's international marketing conference, and Judge expressed concern that Miller had not responded to Harvey's January 11, 2000, request to inspect the breweries in India. (PPFOF ¶ 202; Judge Decl. ¶ 22.)

On March 1, 2000, IBI informed Sega that it had completed a "purchase option agreement" for the Rajasthan brewery.  (DPFOF ¶ 119; PPFOF ¶ 72.)  In an e-mail, Judge wrote to Sega that "[s]ince this brewery is being purchased specifically for producing the Miller brands it is important that you approve the plant before we proceed any further.

---

[7]Murray did not visit Mohan's Delhi brewery.  (DPFOF ¶ 111.)

To this end, please let us know of suitable dates for your visit ASAP." (Cade Aff. Ex. 41; PPFOF ¶ 74; *see* PPFOF ¶ 132.) IBI did not forward the alleged purchase option agreement to Miller. (DPFOF ¶ 120.)

On March 13, 2000, Miller acknowledged IBI's proposal of the Rajasthan brewery and again provided IBI with information about Miller's brewing standards and the minimum equipment required to brew Miller beer. (DPFOF ¶ 122.) In the letter dated March 13, 2000, Miller's Cochran wrote as follows:

> I am writing regarding next steps that need to be taken so that Miller can move forward with a full assessment of the Rajasthan brewery that IBI is contemplating for acquisition. We all agree that a visit by Giorgio Sega will be necessary to gain this assessment from Miller's point of view.
>
> To this end, enclosed is a letter written by Giorgio regarding the requirements for brewing Miller products. In order to make his visit a productive use of time, he suggested that these materials be reviewed and acknowledged in advance. His letter summarizes some of the information that he has passed to you over the past 18 months or so, as well as clarifying all of the requirements for brewing of Miller products – processes, ingredients, equipment, hygiene, etc.
>
> Please review these requirements with your people so that we can discuss an appropriate time for Giorgio to visit the brewery for assessment. . . .
>
> . . . . We look forward to taking this to the next step and I believe Giorgio's complete review of requirements allows us to do this.

(Cade Aff. Ex. 52 at MBC 000284; PPFOF ¶ 76.) Sega requested that IBI review the technical materials and coordinate with Rajasthan to ascertain whether Rajasthan could meet Miller's requirements in advance of a second visit to India. (DPFOF ¶ 123.) Sega also wrote:

As you know, the License Agreement between Miller Brewing Company and India Breweries, Inc. requires IBI to obtain Miller's written approval of the brewery and the Licensed Beers made at the brewery prior to beginning commercial brewing of each Licensed Beer. If brewing is to be performed by a sub Licensee or a contract brewer, Miller must approve in writing the brewer, the brewery, the confidentiality protection relating thereto, and the terms of the sublicensing/contract brewing relationship between IBI and the sub Licensee or contract brewer.

(Cade Aff. Ex. 28 at IBI 001073; *see* PPFOF ¶ 110; Defs.' Resp. ¶ 110.) He continued later in the letter:

Miller produces our brands using the "high gravity" process. . . . This process is not presently available in India, and requires the use of specialized equipment to process our brands. I am attaching a list of Minimum Process Equipment; Packaging Equipment and Laboratory Equipment that we would expect to find at your prospective brewery before we can approve the site for production of our brands. You must insure that this equipment is available and functional at your prospective brewery, or that steps are being taken for its purchase and installation, in the event they are not currently available. I have already outlined this list on my report on Mohan Meakin, but I will send it again.

Upon receipt of your assurance that systems; equipment; laboratory equipment; hygiene; process and packaged product procedures and specifications can be met at your prospective brewer, and that there is a total commitment to purchase and install what is missing, I will schedule a visit to the Raj[a]sthan brewery.

(Cade Aff. Ex. 28 at IBI 001075-76; *see* PPFOF ¶ 111; Defs.' Resp. ¶ 111.)

In April of that year, IBI confirmed receipt of the March 13 letter and said it had forwarded Miller's "process guidelines" to Mohan Meakin's brewmaster, who was working with brewers and engineers at Rajasthan and who was expected to provide a detailed report in the near future. (DPFOF ¶ 124.) IBI told Miller that following receipt of

14

the report from Rajasthan, assuming the brewery met with Miller standards, IBI would arrange for another visit by Miller to inspect the brewery. (DPFOF ¶ 125.)

In an e-mail of September 3, 2000, IBI's Judge told Miller's Berg and Cochran:

> We are also in negotiations as you know with the Rajasthan Brewery which we are trying to purchase. There are complex issues since it belongs to a public company and has large liabilities. Discussions are now on to see if we can start with a contract brew arrangement and sort out the purchase in due course. We are confident we can obtain such a contract within the month. We are not as confident that it will be acceptable to Miller's standards although it is a Danbrew built brewery and the best brewery in south Asia according to Ernst & Young.

> As a way of increasing the value of a visit by Georgio and your team we are also in discussion with several other breweries in India (in Himachal Pradesh, Haryana and Karnataka states) for contract brewing or purchase deals. We would hope that we can have several options for you to look at by the end of this month. Please look for a window in your and Georgio's schedule which would be suitable for this visit.

(DPFOF ¶ 127; Cade Aff. Ex. 32.)

IBP and Rajasthan Breweries Ltd. (RBL) entered a Memorandum of Understanding (MOU) on October 25, 2000. (DPFOF ¶ 128; PPFOF ¶ 149.) In the MOU, IBP and RBL agreed "to work together in good faith to advance negotiations quickly to reach a potential Purchase Agreement for the Rajasthan Brewery assets." (Cade Aff. Ex. 29.) The MOU anticipated the execution of an "Interim Production Agreement" prior to final purchase of the brewery, which would allow IBP to contract brew. (Cade Aff. Ex. 29.) The MOU indicated that the subsequent Interim Production Agreement would be "drawn up and signed forthwith but it is conditional on the IBPL's brewmaster's approval." (DPFOF ¶ 130;

15

Cade Aff. Ex. 29.) However, the Interim Production Agreement was never executed. (DPFOF ¶ 131.)

Previously, the Rajasthan brewery produced Stroh's beer. (PPFOF ¶ 141.) The Rajasthan brewery was constructed in 1994 by Danbrew, a well-known international brewery engineering firm. (PPFOF ¶ 142.) In November 2000, IBI asked Miller to inspect the Rajasthan brewery. (PPFOF ¶ 133.)

IBP and Him Neel Breweries Limited (HNBL) executed an MOU on November 1, 2000. (DPFOF ¶ 132; PPFOF ¶ 150.) In this MOU, IBP and HNBL agreed "to work together in good faith to advance negotiations quickly to reach a potential asset sale agreement for the Him Neel Brewery assets." (Cade Aff. Ex. 30.) The Him Neel MOU stated that it was neither a commitment nor binding on both parties until they entered into an asset sale agreement by which IBP would purchase the Him Neel brewery. (DPFOF ¶ 134.) The Him Neel MOU permitted the execution of an "Interim Production Agreement" prior to final purchase of the brewery, for contract brewing at Him Neel. (Cade Aff. Ex. 30.)

On November 7, 2000, IBI told Miller that it had entered agreements with the Rajasthan and Him Neel Breweries for immediate contract production of Miller beer. (DPFOF ¶ 137.) Although IBI's e-mail of September 3 indicated that IBI was in discussions with several breweries in India other than Rajasthan, the November 7, 2000, letter was the first mention of Him Neel by name. (Cade Aff. Ex. 32; Def.'s Ex. 60 at IBI 1220.)

On November 14, 2000, Miller responded and requested copies of the agreements with Rajasthan and Him Neel, as well as the list of processing equipment for both breweries. (DPFOF ¶ 139.) Miller's letter reminded IBI that a second trip by Miller to India was conditioned on the "presence and operation of process equipment required for

16

production of Miller brands and the ability to meet Miller's quality standards." (DPFOF ¶ 141.)

Because IBI did not own Rajasthan and Him Neel, it took several months of demands to secure equipment lists from the owners of those breweries. (Judge Decl. ¶ 20; Cade Aff. Ex. 2 at 122; *see* PPFOF ¶ 135.) IBI's Judge believes he told and/or wrote to Miller about the cause of the delay. (Cade Aff. Ex. 2 at 122; *see* PPFOF ¶ 135.)

IBI did not send Miller copies of its alleged contracts with Rajasthan and Him Neel prior to December 31, 2000. (DPFOF ¶ 140.) Because Rajasthan and Him Neel were not owned or affiliated with either IBP or Mohan, Miller's Berg wanted to confirm IBI's contractual relationship with the breweries before Miller would proceed with the approval process. (DPFOF ¶ 143.)

On or about November 23, 2000, IBI provided Miller with the technical report or specifications for the Rajasthan brewery. (DPFOF ¶ 144; PPFOF ¶ 104.) The Rajasthan brewery lacked equipment necessary for the production of Miller beer. (DPFOF ¶ 145.) On November 28, 2000, Miller advised IBI that the Rajasthan brewery was unacceptable given that it lacked equipment necessary for the production of Miller beer. (DPFOF ¶ 146.)

During calendar year 2000, IBI's Judge and Harvey made several oral requests of Miller's Cochran and Berg to have Sega or someone at Miller inspect the Artos, Him Neel and Rajasthan breweries. (PPFOF ¶ 203; Judge Decl. ¶ 23.) And in December 2000, IBI asked Miller to travel to India to inspect Him Neel in December 2000. (PPFOF ¶ 134.)

17

In a letter dated December 12, 2000, Sega wrote to Berg that in his opinion Rajasthan was not capable of producing beer to Miller's quality standards because "[a]ll Miller brands are produced using the High Gravity Brewing process" and that Rajasthan "does not have the equipment required for High Gravity brewing," such as nineteen listed items. (Cade Aff. Ex. 33 at MBC 000378; PPFOF ¶ 112.) Sega stated that the equipment listed was "basic equipment we would require for high gravity brewing and processing of any and all of our brands, as well as basic equipment we'd require to meet our packaging standards. Since this equipment is lacking at Rajasthan, I see no benefit is [sic] visiting the brewery at this time. No equipment list is available for the Him Neel brewery, so there is no sense in visiting that plant either." (Cade Aff. Ex. 33 at MBC 000378; PPFOF ¶¶ 113, 114.) Sega told Berg that Miller "should refrain from additional trips to India until we are reasonably sure that the information we receive from prospective breweries clearly show their capability of applying our High Gravity Process and formulation, and that the breweries possess the infrastructure required to meet our Quality Standards." (Cade Aff. Ex. 33 at MBC 000379; PPFOF ¶ 115.)

On December 18, 2000, Miller again informed IBI that it did not make sense for Miller to visit Rajasthan or Him Neel until the requisite equipment was in place and reminded IBI that Miller had not yet received the technical specifications for the Him Neel brewery. (DPFOF ¶ 150.)

On December 22, 2000, IBI provided Miller with the Him Neel technical specifications. (DPFOF ¶ 153; PPFOF ¶ 105.) A centrifuge is required to brew Miller beer and the Him Neel brewery does not have one. (DPFOF ¶¶ 170-171.) Although a centrifuge is on Miller's minimum required equipment list, IBI's expert, Bruce Murray,

opined that a North American quality beer can be produced without the use of a centrifuge. (DPFOF ¶ 168.)  Although he considered a centrifuge optional, he estimated that it would take sixteen weeks to install a centrifuge in the Him Neel brewery.  (DPFOF ¶ 172.)

The Him Neel brewery was constructed by Steinecker of Germany, a well-known and well-thought-of brewery construction company.  (PPFOF ¶ 136.)  Previously, the Him Neel brewery brewed Beck's beer.  (PPFOF ¶ 137.)  IBI's expert, Murray, opined that  "the Him Neel brewery is well within the standards necessary to brew North American type beers and could have met the requirements of the licence agreement with Miller Brewing Company.  In some cases it may be necessary to add certain pieces of equipment or systems and that could be done."  (Cade Aff. Ex. 26 at 23 (cited in PPFOF ¶ 139).)

The License Agreement between Miller and IBI automatically terminated on December 31, 2000.  (DPFOF ¶ 156.)

In a letter to Berg dated January 3, 2001, about Him Neel, Sega stated that Him Neel "is not designed to apply our formulations and high gravity process" and found that the brewery was not qualified to meet Miller quality standards.  (Cade Aff. Ex. 42 at IBI 001279-001280; *see* PPFOF ¶¶ 116, 117.)  Sega said his comments were based on the fact that all Miller brands are produced using the high gravity brewing process and that Him Neel did not have the equipment required for high gravity brewing, pointing to sixteen different items.  (Cade Aff. Ex. 42 at 1-2; PPFOF ¶ 116.)  Sega said the equipment listed was "basic equipment we would require for high gravity brewing and processing of our brands, as well as basic equipment we'd require to meet and to monitor compliance with our process; microbial and packaging standards."  (Cade Aff. Ex. 42 at IBI 001280; PPFOF

¶ 117.)  On January 5, 2001, Miller informed IBI that because Him Neel lacked equipment necessary for the production of Miller beer, Miller would not be visiting it.  (DPFOF ¶ 157.)

IBI's expert, Bruce Murray, inspected the Him Neel brewery in March 2006. (DPFOF ¶ 158.)  In response to a hypothetical, Murray estimated that in 2000, it would have taken twelve to fourteen weeks to upgrade the Him Neel brewery.  (Cade Aff. Ex. 26 at 24-25, Ex. 15 at 168-70.)

Neither Sega nor anyone at Miller inspected the Artos brewery, the Rajasthan brewery, or the Him Neel brewery.  (PPFOF ¶¶ 128, 129, 130.)  After October 1999, no one from Miller went back to India to inspect breweries in furtherance of the License Agreement.  (PPFOF ¶ 214; Def.'s Resp. ¶ 214.)  No one from Miller told IBI orally that Miller did not have a duty or obligation to inspect the Rajasthan or Him Neel breweries because they were in a different class of brewers.  (PPFOF ¶ 212; Judge Decl. ¶ 45.)

Neither IBI nor IBP owned a brewery in India prior to January 1, 2001. (DPFOF ¶ 90.)  From 1997 to 2005, neither the Rajasthan brewery nor the Him Neel brewery was owned by Mohan Meakin, IBI, IBP, or an IBP wholly-owned subsidiary. (DPFOF ¶¶ 121, 133.)

IBI's expert, Bruce Murray, opined that it would take at least two months to complete a test brew.  (DPFOF ¶ 161.)

Much of the equipment that Miller demanded of IBI's proposed breweries was specific to Miller and its formulations for the brewing of Miller-branded beer.  (PPFOF ¶ 119.)

20

For the past several years, SABMiller has brewed its leading brand of beer in India at Mohan Meakin's Madras and Artos breweries, and at the Him Neel brewery. (PPFOF ¶ 126.)

DISCUSSION

Miller is a Wisconsin corporation; IBI is a corporation organized under the laws of Ontario, Canada; and more than $500 million is at issue concerning plaintiff's claims. Therefore, diversity jurisdiction exists for purposes of 28 U.S.C. § 1332.

The License Agreement at issue provides that "[t]he internal law of the U.S.A. . . . shall govern the dispute" and that any litigation will be determined by suit filed in a state or federal court located in Milwaukee, Wisconsin. (Compl. ¶ 3, Ex. A at 39; Answer ¶ 3.) In this diversity case, this court applies the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Doe v. Roe No. 1*, 52 F.3d 151, 154 (7th Cir. 1995).

Under Wisconsin law, the aim of contract interpretation is to ascertain the intent of the parties. *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506 (1998). Where the terms of a contract are clear and unambiguous, the court construes the contract according to its plain meaning. *Id.* The ambiguous language is construed against the drafter. *Id.* Specific mention of an item in one clause, with the failure to include it elsewhere, is "cogent evidence" that the distinction was intended. *Hunzinger Constr. Co. v. Granite Res. Corp.*, 196 Wis. 2d 327, 339 (Ct. App. 1995).

Under Wisconsin law every contract "implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 146 Wis. 2d 568, 577 (Ct. App. 1988).

21

Nevertheless, there can be no breach of the implied covenant of good faith and fair dealing based on acts that are specifically authorized in a contract. *Id.* "Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a 'bad faith' breach of that contract." *Id.* The covenant of good faith is another way of saying that a contract contains implied conditions as necessary to make sense of the contract – to give the parties what they would have stipulated expressly if at the time of making the contract they had complete knowledge of the future. *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 596 (7th Cir. 1991). The doctrine means an "implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Id.* at 595. But where the terms of the contract are express, no such implied agreement is necessary as a gap-filler. *Super Valu Stores, Inc.*, 146 Wis. 2d at 577. "[E]ven after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain." *Mkt. St. Assocs. Ltd. P'ship*, 941 F.2d at 594.

IBI asserts in Count I that Miller breached the License Agreement by (1) failing to perform its duty to inspect Indian breweries, (2) failing to exercise reasonableness in withholding approval of those breweries, (3) acting in bad faith and in violation of the License Agreement's prohibition of an unlawful act by basing its rejection of breweries and termination of the License Agreement on the lack of high-gravity brewing equipment, (4) acting in bad faith by justifying its termination of the License Agreement on trivial deficiencies, and (5) acting in bad faith by terminating the License Agreement without justification. (Compl. at 8-9.)

For the following reasons, summary judgment must be granted on Count I.

The License Agreement provides for two types of contract breweries, each of which was subject to different approval rights by Miller. The first, with preferred status, consisted of breweries owned by IBP, an IBP wholly-owned subsidiary, or Mohan Meakin; Miller agreed not to unreasonably withhold its consent to contract brewing occurring at those breweries. The second consisted of breweries owned by others; the License Agreement contains no obligation on Miller's part regarding the reasonableness of its withholding approval of such breweries. Miller could reject them for any reason.

Paragraph 1.2 of the License Agreement establishes the distinction between the two types of breweries. Sentence one of Paragraph 1.2 provides that Miller's consent to a sublicense of the agreement by IBI to IBP will not be unreasonably withheld. But no similar "unreasonably withheld" language accompanies sentence two, which is unequivocal: "[N]othing herein requires Miller to approve a sublicensee other than IBP, or a contract brewer other than IBP, an IBP wholly-owned subsidiary, and/or Mohan." (Compl. ¶ 3, Ex. 1 at 3; Answer ¶ 3.) The distinction continues in paragraph 6.14, which provides that neither party can assign or sublicense the agreement without the other's written consent "except that Miller will not unreasonably refuse to consent to the sublicensing of this Agreement to IBP, and Miller will not unreasonably refuse to consent to IBP using Mohan or an IBP wholly-owned subsidiary as a contract brewer." (DPFOF ¶ 94; Compl. ¶ 3, Ex. 1 at 36; Answer ¶ 3.) Again, the "unreasonable" language accompanies only approvals of breweries owned by IBP, IBP wholly-owned subsidiaries, and Mohan Meakin.

23

These paragraphs, as well as others in the License Agreement, show that where the parties intended approval rights to be subject to a reasonableness requirement, they wrote that into the contract. For instance, paragraph 4.4(b) indicates that Miller's approval rights of IBI's marketing plans would be exercised in good faith. (Compl. ¶ 3, Ex. 1 at 21; Answer ¶ 3.) In paragraph 4.3(d), IBI's advertising agency and brand manager for Miller beers were subject to Miller's approval, but Miller promised that its approval would not be unreasonably withheld. (Compl. ¶ 3, Ex. 1 at 20; Answer ¶ 3.)

IBI contends that paragraph 2.5 of the License Agreement applies a reasonableness requirement to approvals of any brewery, not just those owned by IBI, IBP or Mohan Meakin. Paragraph 2.5 states that with respect to each brewery where Miller beer is to be brewed, IBI must conduct commercial scale test brews, and that "[p]rior to beginning commercial brewing of each Licensed Beer at the brewery in the Territory, IBI will obtain Miller's written approval of the brewery and the Licensed Beer(s) made at that brewery, which approval shall not be unreasonably withheld." (DPFOF ¶ 93; Compl. ¶ 3, Ex. 1 at 12; Answer ¶ 3.) Although this sentence does suggest that Miller could not unreasonably withhold approval of *any* brewery, a later portion of the same paragraph adds further requirements only for sublicensees and contract breweries: "Where brewing is to be performed by a sublicensee or a contract brewery no such sublicensed or contract brewing-brewing may take place unless Miller has approved in writing the brewer, the brewery, the confidentiality protection relating thereto, and the terms of the sublicensing/contract brewing relationship." (DPFOF ¶ 93; Compl. ¶ 3, Ex. 1 at 12; Answer ¶ 3.) This sentence does not contain any restriction that Miller's approval must not be "unreasonably withheld," supporting the distinction in Miller's approval rights between the

24

two categories of breweries for purposes of this paragraph as well.  Further, paragraph 2.5 cannot be read without reference back to paragraph 1.2, which, again, states unequivocally that "*nothing* herein requires Miller to approve a sublicensee other than IBP, or a contract brewer other than IBP, and IBP wholly-owned subsidiary, and/or Mohan." (Compl. ¶ 3, Ex. 1 at 3; Answer ¶ 3 (emphasis added).)[8]

Thus, Miller did not promise to exercise reasonableness as to third-party brewers; it could reject them for any reason.

There is no ambiguity in the License Agreement to be construed against Miller as the drafter concerning the absence of an express reasonableness requirement regarding third-party contract breweries.  By the terms of the License Agreement, the absence of a reasonableness requirement was intentional.  Miller agreed to not unreasonably withhold consent regarding brewing at facilities of IBI, Mohan Meakin, IBP, or IBP's subsidiaries, but did not make that promise regarding brewing at other contract breweries.[9]

IBI maintains that Miller's interpretation of the License Agreement should not be accepted by the court because Miller refused to allow discovery into the agreement's drafting.  (Pl.'s Br. in Opp'n at 3.)  According to IBI, at deposition, McNally, Miller's attorney,

_____

[8]IBI contends that the last sentence of paragraph 2.5 – that "Miller need not approve any sublicensing or contract brewing (and/or sublicensee or contract brewers) for any brand(s) other than the Schedule A brands of Licensed Beers" (DPFOF ¶ 93; Compl. ¶ 3, Ex. 1 at 12; Answer ¶ 3) – suggests that only approvals of other brands of beer are exempt from the reasonableness standard, but the court is unconvinced.  This sentence appears to mean that when contract brewing is approved by Miller, that approval extends only to Licensed Beer brands and not to others.  IBI, on the other hand, had a right of first refusal on other brands.  (Compl. ¶ 3, Ex. 1 at 6; Answer ¶ 3.)

[9]Such a distinction makes sense, as IBI, IBP, and Mohan Meakin were known quantities at the time of contracting, while other unnamed contract breweries could not then be measured.  But regardless of sense, the distinction is in the contract language.

claimed attorney-client privilege regarding circumstances surrounding the drafting of the License Agreement and what Miller executives told him about its drafting. (*See id.*) But parole evidence regarding the drafting of the contract is not material. The substance of negotiations preceding the contract and the parties' reasoning during negotiations is not relevant where the express terms of the contract are unambiguous. *Town of Neenah Sanitary Dist. No. 2 v. City of Neenah*, 2002 WI App 155, ¶¶ 17-18, 256 Wis. 2d 296, ¶ 17-18. By its terms, the License Agreement contains the entire understanding of the parties with respect to its terms. (DPFOF ¶ 94; Compl. ¶ 3, Ex. 1 at 37; Answer ¶ 3.) Moreover, any complaints by IBI regarding the invocation of attorney-client privilege should have been addressed in a motion to compel, not as a defense to a summary judgment motion.

IBI concedes that Miller did not withhold approval of Mohan Meakin's Madras or Delhi breweries unreasonably. (Pl.'s Br. in Opp'n at 6; DPFOF ¶ 112; Pl.'s Resp. ¶ 112; *see* DPFOF ¶ 118; Pl.'s Resp. ¶ 118; Cade Aff. Ex. 27.) Further, it is undisputed that neither IBI nor IBP owned a brewery in India prior to January 1, 2001. Therefore, Miller cannot have been in breach of the License Agreement for failing to exercise reasonableness regarding rejection of any brewery owned by IBI, IBP, or Mohan Meakin.

The only breweries remaining are third-party contract breweries. It is undisputed that from 1997 to 2005, neither the Rajasthan brewery nor the Him Neel brewery was owned by Mohan, IBI, IBP, or an IBP wholly-owned subsidiary. The evidence shows that they were owned by RBL and HNBL, respectively. Thus, Miller was permitted to reject the Rajasthan and Him Neel breweries for any reason; the reason did not have to be reasonable.

According to IBI, no one from Miller ever told IBI orally that Miller had no duty to inspect the Rajasthan or Him Neel breweries because they were a different class of brewers. (PPFOF ¶ 212; Judge Decl. ¶ 45.) But the License Agreement did not require Miller to provide such a warning to IBI; IBI was responsible for knowing what was in the document it signed.

IBI contends that it planned to purchase the Rajasthan brewery or commence contract brewing there with the intent to later purchase the facility, but was prevented from finalizing the deal with RBL because Miller would not inspect and approve the facility. (*See, e.g.*, Pl.'s Br. in Opp'n at 11 ("Per the License Agreement, Miller *had* to inspect any brewery owned or was going to own [sic], and that duty was not to be unreasonably withheld.").) Under the terms of the License Agreement, IBI had no right to preliminary approval of a facility before it inked a deal. The License Agreement required IBI to make its contract-brewing deals first. Paragraph 2.5 required IBI to provide Miller with the terms of the contract-brewing agreement and the confidentiality agreement, so, obviously, the contract-brewing agreement had to be in place *before* Miller's approval was required. Similarly, nothing in the License Agreement required Miller to preliminarily approve a brewery before IBI or IBP purchased it. IBI's Judge could not impose a pre-purchase inspection requirement on Miller unilaterally through his e-mail of March 1, 2000, in which he wrote that "[s]ince this brewery is being purchased specifically for producing the Miller brands it is important that you approve the plant before we proceed any further." (Cade Aff. Ex. 41; PPFOF ¶ 74; *see* PPFOF ¶ 132.) Although IBI's hesitation to spend money on a facility purchase or contract-brewing arrangement without preliminary approval of that facility by Miller is understandable from a business viewpoint, the License Agreement was

not set up that way. The License Agreement created two categories of breweries: those owned by IBI affiliates or Mohan Meakin and those owned by others. Nothing in the agreement even hints at a third category of breweries owned by others that IBI or IBP might buy or possibly arrange for use in contract brewing.

IBI argues at length that Miller bore a duty under the License Agreement to inspect Rajasthan and Him Neel (and any other third-party breweries IBI suggested) and that Miller refused to send Sega or other Miller employees to India to inspect them. Paragraph 2.5 states that with respect to each brewery where Miller beer is to be brewed, "IBI (after consultation with *and inspection by Miller*) will conduct (or cause to be conducted) commercial scale test brews of each Recipe that is to be used at that brewery. Prior to beginning commercial brewing of each Licensed Beer at the brewery in the Territory, IBI will obtain Miller's written approval of the brewery and the Licensed Beer(s) made at that brewery, which approval shall not be unreasonably withheld." (DPFOF ¶ 93; Compl. ¶ 3, Ex. 1 at 12; Answer ¶ 3 (emphasis added).) These sentences did not create any *duty* to inspect on Miller's part; at most they give Miller the *right* to inspect. Again, as stated above, although these sentences do suggest that Miller could not unreasonably withhold approval of *any* brewery – and thus not unreasonably withhold inspecting the brewery or waiving any right to inspect as well – a later portion of the paragraph and paragraph 1.2 indicate that Miller's approval of third-party breweries – and thus its responsibility for inspecting them – is not subject to a reasonableness requirement. The permissive nature of an inspection is reinforced by paragraph 2.4(c), which states that members of Miller's brewing staff *may* visit IBI or contract brewers. (DPFOF ¶ 92; Compl. ¶ 3, Ex. 1 at 11; Answer ¶ 3.) Miller had no duty to inspect.

28

IBI also argues that Miller came up with high-gravity brewing equipment requirements for the contract-brewing breweries IBI proffered, when high-gravity brewing violated Indian laws or regulations, the contract provided that IBI would not be required to violate Indian law, and Miller had previously agreed that standard-gravity brewing would be permissible. However, the high-gravity brewing argument and the argument that Miller came up with and other trivial deficiencies are red herrings. Miller did not have to approve third-party contract breweries at all. Thus, whether Miller's high-gravity brewing requirements violated Indian law, whether Miller had previously agreed to standard-gravity brewing, whether Miller unreasonably found high-gravity brewing equipment lacking, and whether other (possibly) missing equipment would nevertheless have justified rejection of breweries such as Rajasthan and Him Neel are all immaterial questions.

Finally, IBI asserts that Miller failed to perform their contract in good faith. However, the covenant of good faith and fair dealing does not override the express terms of a contract. *Super Value Stores*, 146 Wis. 2d at 577. In *Smith v. Rainsoft Water Conditioning Co.*, 848 F. Supp. 1413, 1417 (E.D. Wis. 1994), the court found no breach of the covenant of good faith and fair dealing regarding the approval of prospective dealers where the contract stated specifically that new dealers would be subject to approval by the factory.

In sum, Miller did not have to inspect or approve Rajasthan, Him Neel, or any other contract brewery; IBI, IBP and its subsidiaries did not own any breweries; IBI agrees that Miller reasonably rejected Mohan Meakin's Delhi and Madras breweries; and IBI abandoned tendering any other Mohan Meakin brewery for contract brewing. Thus, Miller did not breach the License Agreement.

29

An alternative basis for this decision is worthy of note. If IBI was going to use a contract brewer, Miller had to approve "the brewer, the brewery, the confidentiality protection relating thereto, and the terms of the sublicensing/contract brewing relationship" before any contract brewing began. (DPFOF ¶ 93; Compl. ¶ 3, Ex. 1 at 12; Answer ¶ 3.) Obviously, if Miller had the right to approve the confidentiality protections and the contract brewing terms, then IBI first had the responsibility for providing those items to Miller.

In March 2000, after IBI first proposed the Rajasthan brewery, Sega reminded IBI of the need for Miller's approval of the confidentiality protection and the terms of the contract brewing relationship. (*See* Cade Aff. Ex. 28 at IBI 001073.)

IBP and RBL entered their MOU on October 25, 2000. (DPFOF ¶ 128; PPFOF ¶ 149). The MOU anticipated the execution of an Interim Production Agreement prior to final purchase of the brewery, but the contemplated Interim Production Agreement was never executed. (DPFOF ¶ 131.) IBP and Him Neel Breweries Limited executed an MOU on November 1, 2000. (DPFOF ¶ 132; PPFOF ¶ 150.) The Him Neel MOU stated that it was neither a commitment nor was it binding on both parties until they entered an asset sale agreement providing for IBP to purchase the Him Neel brewery. (DPFOF ¶ 134.) On November 7, 2000, IBI told Miller that it had entered agreements with the Rajasthan and Him Neel Breweries for immediate contract production of Miller beer. (DPFOF ¶ 137.) On November 14, 2000, Miller responded and reminded IBI of the need to forward copies of the agreements with Rajasthan and Him Neel. (DPFOF ¶ 139.) Berg wanted to confirm IBI's contractual relationship with the breweries before Miller would proceed with the approval process (DPFOF ¶ 143), as was Miller's right under the License Agreement.

Whether IBI's representation that it had contract brewing agreements at Rajasthan and Him Neel was true is not material. It is undisputed that IBI failed to send Miller copies of any such contracts with Rajasthan and Him Neel prior to December 31, 2000. (DPFOF ¶ 140.) Thus, even if a reasonableness requirement existed, Miller reasonably chose not to approve those breweries, as IBI had failed to meet its condition precedent. Further, even if Miller had some duty to inspect contract-breweries, its duty was excused by IBI's failure to provide the contract brewing agreements that might have justified an inspection.

Without an approved contract brewery IBI could not, and did not, have an approved commercial scale test brew by December 31, 2000, and the contract terminated under paragraph ¶ 5.1(g)(ii). In addition, IBI has failed to point this court to a contract brewing agreement as opposed to the MOUs, which, by their terms, are not the Interim Production Agreements contemplated. Thus, as IBI and IBP did not own any brewery, IBI also did not meet the requirements of ¶ 5.1(g)(i).

CONCLUSION

For the above-stated reasons,

IT IS ORDERED that Miller's motion for summary judgment is granted and both of IBI's counts are dismissed.

Miller's counterclaims for fraudulent inducement and breach of contract remain pending, as Miller's motion attacked IBI's case but did not discuss the effect of the summary judgment motion on Miller's counterclaims.

IT IS ORDERED that within seven days of this Decision and Order Miller must file either a status report indicating its plans to prosecute the counterclaims or a stipulation of dismissal regarding the counterclaims.

Dated at Milwaukee, Wisconsin, this 11th day of October, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE